## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

THE AVE MARIA FOUNDATION;        )
AVE MARIA COMMUNICATIONS         )
(a/k/a "Ave Maria Radio"); DOMINO'S)
FARMS PETTING FARM;              )
RHODORA J. DONAHUE               )
ACADEMY, INC.; and THOMAS        )
MORE LAW CENTER,                 )
                                 ) Case No. 2:13-cv-15198
            Plaintiffs,          )
      v.                         ) MOTION FOR TEMPORARY
                                 ) RESTRAINING ORDER
KATHLEEN SEBELIUS, Secretary of  )
the United States Department of Health ) Judge Stephen J. Murphy, III
and Human Services; UNITED       )
STATES DEPARTMENT OF             ) Magistrate Judge Mark A. Randon
HEALTH AND HUMAN SERVICES;       )
HILDA SOLIS, Secretary of the United )
States Department of Labor; UNITED )
STATES DEPARTMENT OF LABOR;      )
TIMOTHY GEITHNER, Secretary of   )
the United States Department of the
Treasury; and UNITED STATES
DEPARTMENT OF THE
TREASURY,

_____ Defendants. _____

THOMAS MORE LAW CENTER
Richard Thompson, Esq. (P21410)
Erin Mersino, Esq. (P70886)
24 Frank Lloyd Wright Drive
P.O. Box 393,
Ann Arbor, MI 48106
emersino@thomasmore.org
(734) 827-2001
*Attorneys for Plaintiffs*

## PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER & BRIEF IN SUPPORT

PLEASE TAKE NOTICE that at the earliest possible time for the court to hear this motion, Plaintiffs The Ave Maria Foundation, Ave Maria Communications, Domino's Farms Petting Farm, Rhodora J. Donahue Academy, Inc., and Thomas More Law Center, by and through their undersigned counsel, move the court for a Temporary Restraining Order pursuant to Fed. R. Civ. P. 65(b) and LR 65.1 in order to prevent immediate irreparable injury to Plaintiffs' fundamental rights and interests.

On December 20, 2013, the Honorable Robert Cleland issued a preliminary injunction in *Legatus v. Sebelius*, No. 12-12061, ECF No. 91 (E.D. Mich 2013). Legatus is a nonprofit Catholic organization that is covered by the same insurance plan as the Plaintiffs here. Despite this similarity and the fact that in comparable cases the government has required plaintiffs covered by the same employee health plan to litigate their claims together, *Mersino Dewatering v. Sebelius*, No. 1: 13-cv-1329, Mot. Trans., ECF 7 (D.D.C. Sept. 23, 2013), Defendants refused Plaintiffs' request to join the action before Judge Cleland. Plaintiffs also sought to be included in the action currently pending before the Honorable Lawrence Zatkoff, *Domino's Farms Corp. v. Sebelius*, No. 13-1654 (E.D. Mich 2013). But Defendants refused this request, and the Domino's Farms Corp. plaintiffs' October

2

7, 2013 motion seeking to add Plaintiffs The Ave Maria Foundation, Ave Maria Communications, Domino's Farms Petting Farm, Rhodora J. Donahue Academy, Inc., and Thomas More Law Center was denied on December 20, 2013. Hours later, Plaintiffs filed their complaint before this Court. Due to the late date, Plaintiffs are forced to request injunctive relief on an emergency basis because the HHS Mandate will be enforced against them beginning January 1, 2014.

Plaintiffs here seek the same relief Judge Cleland has already granted to similarly situated nonprofit plaintiffs who share the same employee health plan. For the reasons contained in Judge Cleland's thoughtful and persuasive December 20th order and opinion, and the reasons set forth in Plaintiffs' brief accompanying this motion, the Court should enjoin enforcement of Defendants' Health and Human Services Mandate (hereinafter the "Mandate").

The Mandate violates Plaintiffs' rights guaranteed by the First Amendment to the United States Constitution and the Religious Freedom Restoration Act of 1993, 107 Stat. 1488, as amended, 42 U.S.C. § 2000bb *et seq*. For the purposes of this request for a temporary restraining order, the Plaintiffs focus solely on their RFRA claim. Plaintiffs do not forfeit any of the claims alleged in their complaint.

Plaintiffs have made attempts to resolve this matter prior to seeking this temporary restraining order ("TRO"). Undersigned counsel made contact with the Department of Justice, specifically Benjamin Berwick and Bradley Humphreys

who advised that Defendants do not consent to the relief requested herein.  With the limited amount of time before January 1, 2014, and inability to reach concurrence with the Defendants prior to this date, Plaintiffs had no choice but to seek this emergency relief from the Court.

Plaintiffs' counsel will provide notice of this TRO request by sending a copy of this motion and brief to the Department of Justice via facsimile at (202) 616-8470, and to Benjamin Berwick and Bradley Humphreys via email.  The phone number for the Department of Justice is (202) 514-3367.

Respectfully submitted this 23rd day of December, 2013.


*Attorneys for Plaintiffs:*

THOMAS MORE LAW CENTER

s/ Erin Mersino_____
Erin Mersino, Esq. (P70886)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
(734) 827-2001
emersino@thomasmore.org

s/ Richard Thompson_____
Richard Thompson, Esq. (P21410)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
(734) 827-2001
rthompson@thomasmore.org

4

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| THE AVE MARIA FOUNDATION; AVE MARIA COMMUNICATIONS (a/k/a "Ave Maria Radio"); DOMINO'S FARMS PETTING FARM; RHODORA J. DONAHUE ACADEMY, INC.; and THOMAS MORE LAW CENTER | ) ) ) ) ) ) ) ) | Case No. 2:13-cv-15198 |
| Plaintiffs, v. | ) ) ) ) | MOTION AND BRIEF FOR TEMPORARY RESTRAINING ORDER |
| KATHLEEN SEBELIUS, et al., | ) ) | Judge Stephen J. Murphy, III |
| Defendants. | ) ) ) ) ) ) | Magistrate Judge Mark A. Randon |

THOMAS MORE LAW CENTER
Richard Thompson, Esq. (P21410)
Erin Mersino, Esq. (P70886)
24 Frank Lloyd Wright Drive
P.O. Box 393,
Ann Arbor, MI 48106
emersino@thomasmore.org
(734) 827-2001
*Attorneys for Plaintiffs*

---

# PLAINTIFFS' BRIEF IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

---

## ISSUE PRESENTED

I.     Whether by forcing Plaintiffs to choose between harming their organization by not offering insurance or offering insurance that violates Plaintiffs' sincerely held religious beliefs Defendants' enforcement of the HHS Mandate causes irreparable harm sufficient to warrant immediate injunctive relief.

## CONTROLLING AUTHORITY

Religious Freedom Restoration Act of 1993 ("RFRA"), 107 Stat. 1488, as amended, 42 U.S.C. § 2000bb *et seq.*

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520 (1993)

*Elrod v. Burns*, 427 U.S. 347 (1976)

*Sherbert v. Verner*, 374 U.S. 398 (1963)

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) (en banc), cert. granted, 2013 U.S. LEXIS 8418 (U.S. Nov. 26, 2013) (Case No. 13-354)

*Korte v. Sebelius*, 735 F.3d 654; 2013 U.S. App. LEXIS 222748 (7th Cir. 2013).

*Zubik v. Sebelius,* No. 13-cv-1459, 2013 U.S. Dist. LEXIS 165922 (W.D. Penn, Nov. 21, 2013)

*The Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 12-2542, 2013 U.S. Dist. LEXIS 176432 (E.D.N.Y. Dec. 16, 2013)

*Legatus v. Sebelius*, No. 12-cv-12061, Order Granting Prelim. Inj. (E.D. Mich Dec. 20, 2013)

*Reaching Souls International, Inc. v. Sebelius*, No. 5:13-cv-01092, Order Granting Prelim. Inj. (W.D. Okla. Dec. 20, 2013)

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................ iv

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ................................................................................ 1

ARGUMENT ...................................................................................................... 12

I.    Plaintiffs are Likely to Succeed on the Merits ............................................. 13

    A.    The HHS Mandate violates the Religious Freedom Restoration
    Act ........................................................................................................ 13

        1.    The HHS Mandate substantially burdens Plaintiffs' free
exercise of religion ...................................................................................... 14

        2.    The HHS Mandate does not further a compelling interest ....... 21

        3. The HHS Mandate does not employ the least restrictive means to
further the government's stated interest……………………………………25

II.   Plaintiffs will suffer irreparable harm without injunctive relief ................... 27

III.  Granting injunctive relief will not cause substantial harm to
others…………………….. ..................................................................... 27

IV.   Granting injunctive relief is in the public interest ......................................... 28

V.    The balance of harms favors granting Plaintiffs an injunction ..................... 28

CONCLUSION .................................................................................................. 30

CERTIFICATE OF SERVICE ............................................................................ 31

## INTRODUCTION

Plaintiffs The Ave Maria Foundation, Ave Maria Communications, Domino's Farms Petting Farm, Rhodora J. Donahue Academy Inc., and Thomas More Law Center are nonprofit corporations that seek a temporary restraining order to enjoin the unconstitutional and illegal directives of the Health and Human Services Mandate.[1]   The Mandate strips Plaintiffs of their constitutionally protected rights to religious freedom and free speech, disregards Plaintiffs' right of conscience, and is completely irreconcilable with the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* ("RFRA"), and the First Amendment. It requires Plaintiffs to supply or facilitate coverage of contraceptive and abortifacient products, services, and related counseling to their employees in violation of Plaintiffs' sincerely held religious beliefs.

Defendants issued an "accommodation" that does not alleviate the burden the Mandate creates because Plaintiffs' health insurance plans still serve as the

---

[1] The Sixth Circuit's recent decision dealing with a for profit company's objections to the HHS Mandate, *Autocam v. Sebelius*, 730 F.3d 618 (6th Cir. 2013), has no bearing on the claims asserted by The Ave Maria Foundation, Ave Maria Communications, Domino's Farms Petting Farm, Rhodora J. Donahue Academy Inc., and Thomas More Law Center.  The Court specifically stated, "[w]e recognize that many religious groups organized under the corporate form have made successful Free Exercise Clause or RFRA claims, and our decision today does not question those decisions." *Autocam,* 730 F.3d. at 627 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 525 (1993); *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004) *aff'd*, 546 U.S. 418 (2006)).

conduit by which "free" contraceptive and abortion-inducing drugs and devices are delivered to Plaintiffs' employees in a manner directly contrary to Plaintiffs' religious beliefs.   Further, knowingly and freely enabling others to use, or facilitating the use of contraceptive or abortion-inducing drugs and services, is itself sinful under Catholic teaching.   (Ex. 2, Donovan Decl. ¶ 31).   "For every sin of cooperation in a grave sin of contraception or abortion, there is a second sin against charity (that of scandal to the person with whom the employer cooperates)."   *Id.* at ¶ 34. Defendants' "accommodation" is merely a shell game and does not address Plaintiffs' fundamental religious objection to improperly facilitating access to contraceptive and abortion-inducing products and services.

The Mandate poses an urgent threat to the Plaintiffs, forcing them to comply with its terms by January 1, 2014.   Because Plaintiffs are facing imminent, irreparable harm to their religious freedom and constitutional rights, they seek emergency injunctive relief from the Court.  Fed. R. Civ. P. 65.

## BACKGROUND

### Plaintiffs

Plaintiffs The Ave Maria Foundation, Ave Maria Communications, Domino's Farms Petting Farm, Rhodora J. Donahue Academy Inc., and Thomas More Law Center are all nonprofit corporations that were founded upon, adhere to, and strive to further, the teachings of the Roman Catholic Church. (Ex. 1,

2

Monaghan Decl.¶¶ 7, 9, 28)  The Ave Maria Foundation "was founded in fidelity to the Magisterial Teaching of the Catholic Church and these teachings are and have been observed by The Ave Maria Foundation throughout its existence in accordance with the intention and desire of the director of The Ave Maria Foundation that the organization retain in perpetuity its identity as such an organization." *Id.* at ¶ 9.  "The Ave Maria Foundation exists to serve the common good, as elaborated in the moral and social teachings of the Roman Catholic Church, and to foster the Kingdom of God on earth through teaching the inherent dignity of every human being, a dignity based on our creation in the image and likeness of God and raised to a new level by our redemption in Jesus Christ."  *Id.* at ¶ 12.  The Foundation's purpose is "to support the advancement of the Roman Catholic faith and the Apostolic Mission of the Church, including evangelization and education of the faith."  *Id.* at ¶ 10.  It fulfills this mission by supporting "educational institutions which operate consistently with Ex Corde Ecclesia, and through the use of media, including without limitation, radio, television, motion pictures and global telecommunications networks."  *Id.*

The Ave Maria Foundation supports Plaintiff Rhodora J. Donahue Academy, Inc., which is a religious non-profit corporation that "operates as a primary educational institution offering K-12 grade education grounded in the traditions of the Roman Catholic Church."  *Id.* at ¶19.  Like all of the Plaintiffs in this case,

3

Rhodora J. Donahue Academy, Inc., is committed to the teachings of the Catholic Church.   *Id.* at ¶ 20.   Among the ways it demonstrates this commitment is by celebrating Mass daily on-site for students, staff, faculty, and their family members. *Id.*

Plaintiff Ave Maria Communications d/b/a Ave Maria Radio is also supported by contributions from The Ave Maria Foundation and is a "nonprofit corporation that furthers the education of individuals in the Catholic religion (and beyond) by producing Catholic radio programming and by employing radio, internet, and other media to offer news, analysis, teaching, devotions, and music that demonstrates the good news that Jesus is Lord over all areas of life and that the teachings of Christ, through His Church, offers a rational view of the world, a deep sense of spirituality, a firm family life, enhanced human relationships, and the creation of a culture of life and love." *Id.* at ¶ 22.

Similarly, the Thomas More Law Center was founded by Thomas Monaghan, is supported with donations from The Ave Maria Foundation, and is a nonprofit corporation "dedicated to education and litigation on issues of human life, religious freedom, and traditional family values."   *Id.* at ¶ 25.   Thomas Monaghan also founded and is a director of Plaintiff Domino's Farms Petting Farm, a "nonprofit corporation that was founded to foster an understanding and

appreciation of an agricultural lifestyle and to operate an animal petting farm and other related events for educational purposes." *Id.* at ¶¶ 26-27.

All of the Plaintiff organizations were "founded, organized, and are maintained in conformity with and/or for furtherance of the teachings of the Catholic Church." *Id.* at ¶ 28. The Plaintiff organizations "acknowledge the Sacred Heart of Jesus as the true head of the organization and [ ] dedicate [their] work and all that [they] are to Him." *Id.* at ¶ 13. Plaintiffs are compelled by their faith to follow Catholic teachings including those contained in Pope Paul VI's 1968 encyclical Humanae Vitae, which states "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means"—including contraception—is a grave sin. (Ex. 4, Kresta Decl. ¶ 7). Plaintiffs subscribe to authoritative Catholic teaching regarding the proper nature of health care and medical treatment. For instance, Plaintiffs believe, in accordance with Pope John Paul II's 1995 encyclical Evangelium Vitae, that "'[c]ausing death' can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life." *Id.* Additionally, the Catholic Church "has consistently taught, throughout its entire existence, that contraception deliberately frustrates matrimony's natural

power to generate life and is an offense against the law of God and of nature." (Ex. 2, Donovan Decl. ¶ 9).

Plaintiffs do not believe that contraception or abortion properly constitute health care, but rather, involve immoral practices and the destruction of innocent human life. (Ex. 1, Monaghan Decl. ¶¶5, 28-30; Ex. 2. Donavan Decl. ¶¶ 9-14, 18-19). Plaintiffs' sincerely held religious beliefs prohibit them from facilitating access to, participating in, paying for, training others to engage in, or otherwise supporting abortion, contraception, sterilization or abortifacients, which they believe involve gravely evil acts. (Ex. 1, Monaghan Decl. at ¶¶ 17, 28-30; Ex. 2, Donavan Decl. ¶¶ 22-36). Further, Plaintiffs' faith demands that they not enable, encourage, or facilitate others in doing an action which they themselves are morally prohibited from doing. (Ex. 2, Donovan Decl. ¶¶ 28-35).

Accordingly, Plaintiffs designed their group health insurance plan through the Ave Maria Human Resources and Blue Cross/Blue Shield of Michigan to specifically exclude coverage for abortion, abortifcients, sterilization, and artificial contraception. (Ex. 1, Monaghan Decl. ¶¶ 31- 33; Ex. 3, Zmuda Decl. ¶¶ 5, 12-13). Plaintiffs believe providing their employees with health insurance is a form of Christian stewardship and if they are forced to cease providing their employees with health insurance this would violate their "religious duty to provide for the

health and well-being of [Plaintiffs'] employees and their families." (Ex. 1, Monaghan Decl. ¶ 49).

## The Mandate

The Affordable Care Act requires all non-exempt group health plans and health insurance issuers to provide coverage without "cost sharing" for certain products and services for women as "preventative care," and directed the Secretary of the United States Department of Health and Human Services to determine what would constitute "preventative care." 42 U.S.C § 300gg-13(a)(4). Defendants directed the Institute of Medicine ("IOM") to compile recommended guidelines describing which drugs, procedures, and services should be covered as preventative care for women. Women's Preventative Services: Required Health Plan Coverage Guidelines, *available at* http://www.hrsa.gov/womensguidelines (last visited Dec. 20, 2013). IOM issued a report recommending that required preventative services include "the full range of Food and Drug Administration ['FDA']-approved contraceptive methods, sterilization procedures, and patient and education counseling for women with reproductive capacity." *Id.* Defendants adopted the IOM recommendations in full. 76 Fed. Reg. 46621 (published Aug. 3, 2011). The dissenting member of the committee warned that"[t]he process set forth in the [Affordable Care Act] was unrealistic in the time allocated to such an important and time-intensive undertaking" and that "[r]eaders of the Report should

be clear on the fact that the recommendations were made without high quality, systematic evidence of the preventative nature of the services considered" and that "evidence that the use of the services in question leads to lower rates of disability or disease and increased rates of well-being is generally absent." (Ex. 7, IOM Dissenting Op. at 232).  Rather than being a science-based review, the committee's review process "tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy" where the "process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee's composition." *Id.*

Defendants received over 200,000 responses to their request for comments on the amended Interim Final Rules, many of which were from religiously-affiliated institutions warning that the religious employer exemption to the Mandate requiring coverage for all FDA-approved contraceptives was too narrow, and that "the limited scope of the exemption raised religious liberty concerns." *Roman Catholic Archdioceses of N.Y. v. Sebelius*, slip op. at 7 (Ex. 9) No. 1:12-cv-02542, (E.D.N.Y. Dec. 16, 2013) (citing 77 Fed. Reg. 8,727).  But Defendants finalized the amended Interim Final Rules on February 15, 2012, without making

any change to the criteria required for an organization to be eligible for the religious employer exemption.[2] *Id.*

Defendants allowed a "temporary enforcement safe harbor" period once the Interim Final Rules issued during which time they were "to develop and propose changes to these final regulations that would meet two goals – providing contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services [. ]" 77 Fed. Reg. 8,727. In response to proposals set forth regarding possible means of accommodating religious organizations' objections to the mandate, Defendants received over 400,000 comments. *See* 78 Fed. Reg. 39,870-71 (July 2, 2013).

Defendants claim to have addressed religious objections to the Mandate in the Final Rules by (1) revising the definition of religious employers who are exempt from the Mandate as a non-profit referred to in § 6033(a)(3)(A)(i) or (ii) of the Internal Revenue Code, which includes churches, their integrated auxiliaries, associations of churches, and the exclusively religious activities of religious orders,

---

[2] To qualify for the religious employer exemption an organization was required to demonstrate the following criteria: "(1) the inculcation of religious values is the purpose of the organization. (2) The organization primarily employs persons who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the organization. (4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.130(a)(1)(iv)(B).

and (2) by providing an accommodation for "eligible organizations" that do not meet the definition of "religious employer." 78 Fed. Reg. at 39,874.  Plaintiffs do not qualify as a "religious employer" and are not covered by any other exemption. *See* 42 U.S.C. § 18011(a)(2) (exempting plans that qualify for "grandfathered" status by meeting criteria such as abstaining from plan changes since the date of March 23, 2010); 26 U.S.C. § 5000A(d)(2)(A)(i)-(ii) (exempting members of "recognized religious sect or division" that conscientiously object to acceptance of public or private insurance funds).

To be an "eligible organization" for purposes of the government's "accommodation" the organization must satisfy the following criteria:

> (1)  The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections. (2) The organization is organized and operates as a nonprofit entity. (3) The organization holds itself out as a religious organization. (4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

45 C.F. R. § 147.131 (b).  Plaintiffs "oppose[] providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections," but also oppose having to self-certify as required

by the "accommodation." If Plaintiffs self-certify as required by the "accommodation," they will be violating a tenant of their faith that forbids facilitating, cooperating with, or providing support for an evil act. (Ex. 2, Donovan Decl. ¶¶ 22-36).

By delivering the self-certification to their insurer administrator, Plaintiffs will trigger the insurer's obligation to make separate payments for contraceptive services for their employees and beneficiaries enrolled in Plaintiffs' health care plan. 78 Fed. Reg. at 39875-76. Plaintiffs will then be required to identify their employees to their insurer for the distinct purpose of enabling and facilitating free access to contraceptive, sterilization, and abortion-inducing drugs, devices, and services. Plaintiffs' insurer, Blue Cross/Blue Shield of Michigan, must then make direct payments for these objectionable drugs, devices, and services during the time Plaintiffs insure an employee, plan participant, or beneficiary through Plaintiffs' health insurance plan. 78 Fed. Reg. at 39,876. Blue Cross/Blue Shield of Michigan will be required to notify plan participants and beneficiaries of the contraceptive payment benefit "contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment" in a group health plan. 78 Fed. Reg. 39,876. Plaintiffs' insurer will be required to provide the contraceptive benefits "in a manner consistent" with the provision of other covered services under Plaintiffs' plan. 78 Fed. Reg. 39,876-77. Thus, it

11

appears that coverage or payment disputes would likely be resolved under the terms of Plaintiffs' existing plan documents, thereby, requiring Plaintiffs to continue to play a central role in facilitating free access to contraceptive, sterilization, and abortifacient services in violation of their sincerely held religious beliefs.

## LEGAL STANDARD

The factors the Court must consider in determining whether to issue a temporary restraining order ("TRO") are the same as those considered for issuing a preliminary injunction. *Workman v. Bredesen,* 486 F.3d 896, 904-05 (6th Cir. 2007); *Southerland v. Fritz*, 955 F. Supp. 760, 761 (E.D. Mich. 1996). The Court must weigh the following factors: "(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest." *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007).

## ARGUMENT

Injunctive relief is necessary and appropriate in this case as each of the four preliminary injunction/TRO factors weigh in Plaintiffs' favor. Without protection from this Honorable Court, Plaintiffs will be forced to violate a fundamental tenet

of their faith by facilitating contraceptive and abortion-inducing drugs and services through their insurance plan, or to suffer harsh governmental sanction for their refusal to abandon the dictates of their faith. The Constitution and the Religious Freedom Restoration Act ("RFRA") prohibit such an obvious and odious governmental attack on religious liberty.

### I. Plaintiff is likely to succeed on the merits

#### A. The Mandate violates RFRA

The Religious Freedom Restoration Act of 1993, 107 Stat. 1488, as amended, 42 U.S.C. § 2000bb et seq. (hereinafter "RFRA"), strictly prohibits the federal government from substantially burdening a person's exercise of religion, except under the narrow conditions set by the Act. The Act commands as follows: "[the] [g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." 42 U.S.C. § 2000bb-1(a). Subsection (b) provides that '[g]overnment may substantially burden a person's exercise of religion *only* if it demonstrates that application of the burden to the person is (1) in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that interest." *Id.* at § 2000bb-1(b) (emphasis added). In its formulation of RFRA, Congress expressly adopted the compelling interest test described in

*Sherbert v. Verner,* 374 U.S. 398 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205 (1972).

RFRA defines "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4); 2000cc-5. Thus, RFRA's protections apply not only to acts of worship but also to actions taken in accordance with one's faith. Plaintiff nonprofit corporations were formed, are managed, and exist in accordance with and/or for furtherance of the Catholic faith. Their selection and operation of a health insurance plan that comports with their religious beliefs is a religious exercise for purposes of RFRA protection.

**1. The Mandate substantially burdens Plaintiffs' free exercise of religion**

The Mandate places a substantial burden on Plaintiffs' sincerely held religious beliefs. The Supreme Court made clear in *Yoder,* that religious exercise is substantially burdened when government action compels individuals "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Yoder,* 406 U.S. at 218. "Plaintiffs cannot facilitate access to, provide, fund, participate in, or support in any way health care insurance which covers artificial contraception, abortion, sterilization, or abortifacients, or related education and counseling without violating [their] deeply held religious beliefs." (Ex. 1,

Monaghan Decl. ¶ 30; Ex. 2, Donovan Decl. ¶¶ 35-36). But this is exactly what the Mandate requires.

Plaintiffs can either (1) provide insurance coverage for the objectionable services in violation of their beliefs; (2) self-certify and directly cause their insurance issuer to provide coverage for the objectionable services in violation of their religious beliefs; (3) cease offering insurance all together, which would harm their business and employees, still subject some of them to fines, and would interfere with their religious exercise of Christian stewardship; or (4) offer coverage that does not comply with the mandate and suffer harsh financial penalties. The Mandate burdens Plaintiffs' religious exercise by pressuring them, under threat of government sanction, to modify their behavior and to violate their religious beliefs. This government-imposed coercive pressure substantially infringes Plaintiffs' free exercise. *Thomas v. Review Bd. Of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981).

In resolving the substantial burden inquiry, courts are not permitted to determine the centrality of a particular religious practice to an adherent's faith or to inquire whether a plaintiff correctly interprets the commands of their faith. 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A); *Thomas*, 450 U.S. at 716 ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their

common faith. Courts are not arbiters of scriptural interpretation."); *Hernandez v. Comm'r of Internal Revenue Serv.,* 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretation of those creeds.").  Thus, the Court must only "determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief."  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1137 (10th Cir. 2013) (en banc), cert. granted, ___S. Ct.___ , (Nov. 26, 2013); *see Korte v. Sebelius*, 2013 U.S. App. LEXIS 22748 at *75-76 (7th Cir. 2013).  A court must accept a plaintiff's description of his or her beliefs and practices, regardless of whether the court, or the government, finds them "acceptable, logical, consistent, or comprehensible." *Thomas*, 450 U.S. at 714-15. "It is enough that the claimant has an 'honest conviction' that what the government is requiring, prohibiting, or pressuring him to do conflicts with his religion." *Korte*, 2013 U.S. App. LEXIS 22748 at *75.

In *Roman Catholic Archdiocese of N.Y. v. Sebelius*, the United States District Court for the Eastern District of New York recently addressed the burden the Mandate poses to religiously objecting nonprofit employers. (Ex. 9).  The court recognized three broad ways that government action may substantially burden religious exercise: "[the] [g]overnment action may: (1) compel the plaintiff to do

16

something that is inconsistent with his religious beliefs; (2) forbid the plaintiff from doing something that his religion motivates him to do; or (3) not directly compel the plaintiff to do something forbidden by his religious beliefs or to refrain from doing something motivated by those beliefs, but instead put substantial pressure on the plaintiff to do so." *Roman Catholic Archdiocese of N.Y.,* slip op. at 19-20 (citing *Hobby Lobby*, 723 F.3d at 1138).   The court determined that the Mandate fits into the first category because it "directly compels plaintiffs, through threat of onerous penalties, to undertake actions that their religion forbids." *Id.* (citing *Hobby Lobby*, 723 F.3d at 1151-52 (Hartz, C.J., concurring); *Korte*, 735 F.3d at 707 (Rovner, C.J., dissenting)).  "[It] is difficult to comprehend any situation where a court could rule that a plaintiff facing government compulsion to engage in affirmative acts forbidden by his religion has not suffered a substantial burden, without implicitly ruling that the belief he has been forced to violate is just not that important."  *Id.* at 21.   Accordingly, the court found that the Mandate substantially burdened the plaintiffs' free exercise of religion. *Id.* at 29 ("[T]here can be no doubt that the coercive pressure here is substantial.").

This Court should find the analysis performed by the district court in *Roman Catholic Archdioceses of N.Y. v. Sebelius* persuasive and should adopt the same standard: "[w]here government action coerces a religious adherent to undertake affirmative acts contrary to his religious beliefs, the "substantial burden" inquiry

under RFRA should focus primarily on the 'intensity of the coercion applied by the government to act." *Roman Catholic Archdioceses of N.Y.,* slip op. at 22 (quoting *Korte,* 735 F.3d at 683; *Hobby Lobby*, 723 F.3d at 1137). Here, the intensity of the government coercion is substantial. If Plaintiffs do not comply with the Mandate, they will be subject to significant fines of $100 per day per beneficiary. *See* 26 U.S.C. § 4980D(b)(1). If they cease providing insurance altogether, the Plaintiff organizations with more than 50 employees will still be subject to substantial financial penalties, and each Plaintiff, regardless of the number of employees, will be violating their duties of Christian stewardship to provide for their employees. If Plaintiffs do comply with the Mandate, either by directly providing the contraceptive and abortifacient products and services, or by facilitating the same result through self-certifying to their insurance issuer, they will be violating the commands of their faith. (Ex. 2., Donovan Decl. ¶¶ 35-36).

The burden the Mandate creates is not alleviated by the accommodation. Plaintiffs are still required to actively participate in the government's plan to increase use of products and services Plaintiffs believe are gravely sinful. *Reaching Souls v. Sebelius,* Order Granting Prelim. Inj. (Ex. 10) (W.D. Okla. Dec. 20, 2013) (rejecting the government's "it's just a form" argument); *but see Priests For Life v. United States Dept. Health and Human Servs.*, Mem. Opinion, No.13-1261 (D.D.C. Dec. 19, 2013). Plaintiffs must sign the self-certification form

stating their objection, compile a list of their employees, and provide both to their health insurance issuer or third party administrator.  Once Plaintiffs complete these actions, their insurance issuer will be required to use the information Plaintiffs have supplied to facilitate and initiate the provision of contraceptive and abortion-inducing products, services, and related counseling.  Plaintiffs' insurance issuer must provide or arrange "payments for contraceptive services" for Plaintiffs' employees as long as the employees remain on Plaintiffs' health plan.  *See* 78 Fed. Reg. at 39,892; 45 C.F.R. § 147.131(c)(2)(i)(B) (for employers offering insured plans, the issuer must "[p]rovide separate payments for any contraceptive services . . for plan participants and beneficiaries for so long as they remain enrolled in the plan").  Consequently, Plaintiffs' decision to offer a group health plan results in the provision of "free" abortion-inducing products, contraception, sterilization, and related counseling, to their employees in a manner contrary to Plaintiffs' religious beliefs.  Further, by requiring Plaintiffs to complete a "self-certification" to avoid directly paying for these services, the government requires Plaintiffs to violate another command of their faith – the command to avoid cooperation in evil. (Ex. 2, Donovan Decl. ¶¶ 34-35).

In *Zubik v. Sebelius*, the United States District Court for the Western District of Pennsylvania issued an injunction preventing the Mandate's enforcement against religiously objecting nonprofit, nonexempt plaintiffs who, like Plaintiffs

here were observant Catholics who argued that the accommodation did not alleviate the burden the Mandate caused to their religious exercise. *Zubik v. Sebelius,* No. 13-cv-1459, 2013 U.S. Dist. LEXIS 165922 (W.D. Penn, Nov. 21, 2013). The plaintiffs in *Zubik* described their objection to the accommodation by analogy, likening the result "to a neighbor who asks to borrow a knife to cut something on the barbecue grill, and the request is easily granted. The next day, the same neighbor requests a knife to kill someone, and the request is refused. It is the reason the neighbor requests the knife which makes it impossible for the lender to provide it on the second day." *Id.* at *81. The *Zubik* court correctly found that the plaintiffs had "a sincerely-held belief that 'shifting responsibility' does not absolve or exonerate them from the moral turpitude created by the 'accommodation'; to the contrary, it still substantially burdens their sincerely-held religious beliefs." *Id.* at *82. Judge Cleland found this analogy instructive and noted,

> [p]reviously when an employer like [Plaintiff] completed paperwork indicating that it would not be providing contraceptive services to its employees, the reason the documentation was used was irrelevant to [Plaintiff]. 'Now, under the 'accommodation,' the reason the documentation is required is so that contraceptive products, services, and counseling can be provided in direct contravention of [Plaintiffs'] sincerely-held religious beliefs. The Government is asking [Plaintiffs] for documentation for what [Plaintiffs] sincerely believe is an immoral purpose, and thus, they cannot provide it.

*Legatus*, Order Granting Prelim. Inj. at 16-17 (Ex. 8) (quoting *Zubik*, 2013 WL 6118696, at *25). This Court should agree that the Mandate and the

"accommodation" substantially burdens Plaintiffs' exercise of their religion and coerces Plaintiffs through threats of crippling fines into acting directly contrary to their sincerely held religious beliefs.

### 2.  The Mandate does not further a compelling government interest

The Mandate and the "accommodation" place a substantial burden on Plaintiffs' free exercise of religion under the RFRA, and, consequently, the government must demonstrate that their regulations further a compelling governmental interest and are the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1.  In evaluating whether the government's regulations pass the compelling interest test, "[t]he theme that emerges is the identification of 'overriding,' 'paramount' governmental interests of the very 'highest order.' Interests of lesser magnitude, and interests that are not paramount, including those that are otherwise served, cannot be considered 'compelling.'  *Legatus,* Order Granting Prelim. Inj. at 17 (Ex. 8).

The regulations at issue here allegedly "advance[] the compelling government interest in safeguarding public health and ensuring that women have equal access to health care."  78 Fed. Reg. 39872.  The government submits that providing women with contraception, abortifacients, and related services without requiring them to pay for it themselves (because their employer or its insurer will be forced to cover the cost via the employer insurance plan) will advance this

21

interest.  *Id.*  But RFRA demands that Defendants do more than allege some general public interest that the regulations supposedly further.   The "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' – the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 430-31 (2006) (quoting 42 U.S.C. § 2000bb-1(b)).  Accordingly, "under RFRA's version of strict scrutiny, the Government must establish a compelling and specific justification for burdening *these* claimants."   *Korte,* 2013 U.S. App. LEXIS 22748 at *83 (emphasis in original).

Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).  Defendants must "specifically identify an 'actual problem' in need of solving" and show that substantially burdening Plaintiffs' free exercise of religion is "actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (June 27, 2011) (internal citations omitted).  Defendants bear the burden of proof and "ambiguous proof will not suffice."   *Id.* at 2739.   When evaluating the broadly asserted government interests allegedly furthered by the Mandate, the Seventh Circuit in *Korte* stated:

> Strict scrutiny requires a substantial congruity−a close "fit"−between
> the governmental interest and the means chosen to further that

22

> interest.  Stating the governmental interest at such a high level of generality makes it impossible to show that the mandate is the least restrictive means of furthering them.  There are many ways to promote public health and gender equality, almost all of them less burdensome on religious liberty.

*Korte,* 2013 U.S. App. LEXIS 22748 at * 84.  Defendants cannot show that forcing Plaintiffs to provide or facilitate health insurance that makes contraceptives and abortifacients available to their employees "without cost sharing," would further the government's stated interest of "safeguarding public health" or "ensuring that women have equal access to health care."   Moreover, Plaintiffs dispute that contraception, abortion, and related services constitute health care or that increased provision of these products and procedures will safeguard public health. (Ex. 6, United States Conference of Catholic Bishops Comment; Ex. 7, IOM Report Dissenting Op.); *See Gilardi v. United States Dep't. of Health and Human Services,* 733 F.3d 1208, 1221 (D.C. Cir. 2013) (noting as to the government's claim that the Mandate "averts 'negative health consequences for both the woman and the developing fetus' that "the science is debatable and may actually undermine the government's cause" and that "giving the government the benefit of the doubt, the health concerns underpinning the mandate can be variously described as legitimate, substantial, perhaps even important, but it does not rank as *compelling*, and that makes all the difference.").

23

In evaluating free-exercise claims, "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder,* 406 U.S. 215. "[A] law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 547 (1993) (citations omitted); *O Centro*, 524 U.S. at 433. Defendants cannot claim the Mandate promotes an interest of the "highest order" when the government has already exempted tens of millions of people from the Mandate's requirements through "grandfathering" provisions and the "religious employer" exemption. *Legatus*, Order Granting Prelim. Inj. at 22 (Ex. 8) ("With tens of millions of people untouched, the Government has undermined its arguments that the HRSA Mandate promotes any compelling government interest."). Consequently, Defendants cannot show that there is a compelling interest in denying an exemption to Plaintiffs. *See Korte*, 2013 U.S. App. LEXIS 22748 at *83-84; *Gilardi,* 733 F.3d at 1222-23; *Hobby Lobby*, 723 F.3d at 1143-44. The Court must "look[] beyond broadly formulated interests justifying the general applicability of government mandates" and must "scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *O Centro*, 546 U.S. at 431. Defendants cannot show that any harm would result from granting an exemption to Plaintiffs. *See Legatus*, Order Granting Prelim. Inj. at 21 (Ex. 8).

### 3.  The Mandate fails to use the least restrictive means

Defendants designed the Mandate, and the narrow religious exemptions to the Mandate, in a way that make it impossible for Plaintiffs to comply with their religious beliefs without facing government sanction.  (Ex. 2, Donovan Decl. at ¶¶ 35-36).  The Mandate is not the least restrictive means by which the government can achieve its stated goals.  As noted by the court in *The Roman Catholic Archdiocese of N.Y.*, "numerous less restrictive alternatives are readily apparent." No. 1:12-cv-02542, slip op. at 34 (Ex. 9).  The court listed examples that would be less restrictive, including that the government could provide the services or insurance coverage directly to plaintiffs' employees, or work with third parties without requiring plaintiffs' active participation, or could provide tax incentives to either consumers or producers of the objectionable products. *Id.*  The government could also offer grants to entities that already provide contraceptive services at free or subsidized rates. The government already subsidizes contraception for certain individuals.  *See, e.g.,* Family Planning grants in 42 U.S.C. § 300, et seq.; Public Health Services Act, Title X, 42 C.F.R. 59.5.

It is clear that Defendants could further their interests without coercing the Plaintiffs to violate their religious beliefs through the Mandate and the "accommodation."  *See Beckwith Elec. Co. v. Sebelius*, No. 8:13-cv-0648, 2013 U.S. Dist. LEXIS 94056 at *60 (M.D. Fla. June 25, 2013) ("Certainly forcing

private employers to violate their religious beliefs in order to supply emergency contraceptives to their employees is more restrictive than finding a way to increase the efficacy of an already established [government-run] program that has a reported revenue stream of $1.3 billion"). The "accommodation" merely provides another way to violate the tenets of Plaintiffs' faith. In light of the alternatives available to achieve the government's stated interest, there is no justification for forcing Plaintiffs to violate their religious beliefs.

Whether the government has employed the least restrictive means to further its interest "depends on a comparison of the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." *S. Ridge Baptist Church v. Indus. Comm'n of Ohio,* 911 F.2d 1203, 1206 (6th Cir. 1990). Here, the cost to Plaintiffs is "incalculable" and "irreparable." *Zubik,* 2013 U.S. Dist. LEXIS 165922 at *99; *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Conversely, there is no measurable cost to the government considering the myriad of exemptions it has already granted from the Mandate.

In sum, the Plaintiffs are likely to succeed on the merits of their claims because the Mandate simply cannot be tolerated under the plain language of the RFRA. The "accommodation" coerces the Plaintiffs to violate their sincerely held religious beliefs – that life is sacred from the moment of conception and that

26

cooperation in acts which attack human life is gravely sinful.  Defendants cannot demonstrate that the Mandate or the "accommodation" through which it applies to Plaintiffs is the least restrictive means of furthering a compelling government interest.

## II. Plaintiffs will suffer irreparable harm without injunctive relief

Plaintiffs will be irreparably harmed unless this Court grants injunctive relief, protecting them from enforcement of the Mandate.  If Plaintiffs do not comply with the Mandate beginning January 1, 2014, they will be subject to significant government imposed fines.   The Mandate deprives Plaintiffs of fundamental First Amendment rights and coerces them to violate the tenets of their faith to avoid government sanction.  It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod,* 427 U.S. at 373: *Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.") (citing *Elrod*)).

## III. Granting injunctive relief will not cause substantial harm to others

Defendants will not be harmed if they are restrained from enforcing the Mandate against Plaintiffs.  Defendants have exempted millions of other citizens from the Mandate's requirements including businesses whose plans are

"grandfathered," and organizations that qualify for the "religious employer" exemption. The significant number of employers who fall within an exclusion or exemption "creates such an 'underinclusiveness' which demonstrates that the Government will not be harmed in any significant way by the exclusion of these few Plaintiffs." *Zubik*, 2013 U.S. Dist. LEXIS 165922 at *106-07 (citations omitted).

## IV.    An injunction is in the public interest

Because the Mandate deprives Plaintiffs of their constitutionally and statutorily protected rights, granting an injunction to prevent this harm serves the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) ("[T]he public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties"). The public interest is best served by preventing the Defendants from compelling individuals to violate their religious beliefs and rights of conscience, protected by RFRA.

## V.    The balance of harms favors an granting Plaintiffs an injunction

The balance of harms favors granting an injunction in this case. The Court has discretion "to grant a preliminary injunction even where the plaintiff fails to

show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued." *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.,* 679 F.2d 100, 104 (6th Cir. 1982)). Here, Plaintiffs have shown a substantial probability of ultimate success on the merits of their claims, and there is no question that the loss of their religious freedom will cause Plaintiffs irreparable harm. *Elrod,* 427 U.S. at. 373. Consequently, injunctive relief is appropriate and necessary.

As noted by Judge Cleland when evaluating claims of a similarly situated nonprofit Catholic organization covered by the same employee health insurance plan, "[d]enying [Plaintiff] a preliminary injunction at this time will effectively grant the Government a default success on the merits—at least until [Plaintiff] can change its self-certification status and thereby exclude contraception to its employees if [Plaintiff] were to succeed at trial." *Legatus,* Order Granting Prelim. Inj. at 32 (Ex. 8). This Court should agree with Judge Cleland's conclusion that "[t]he harm in delaying the implementation of a regulation that may later be deemed constitutional must yield to the risk presented here of substantially infringing the sincere exercise of religious beliefs." *Id.* at 33.

## CONCLUSION

On January 1, 2014, unless the Court enjoins its enforcement, the Mandate will become effective against Plaintiffs and strip them of their right to make health care insurance decisions in line with their Catholic beliefs. *See* 78 Fed. Reg. 39,870 (July 2, 2103); (Zmuda Decl. ¶¶ 11, 15). The balance of harms tips strongly in favor of Plaintiffs. Consequently, injunctive relief is warranted.

Respectfully submitted this 23rd day of December, 2013.

*Attorneys for Plaintiffs:*

THOMAS MORE LAW CENTER

s/ Erin Mersino_____
Erin Mersino, Esq. (P70886)
Richard Thompson (P21410)
24 Frank Lloyd Wright Blvd.
P.O. Box 393
Ann Arbor, MI 48106
(734) 827-2001
emersino@thomasmore.org

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2013, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I certify that a copy of the foregoing has been served by certified U.S. Mail upon all parties for whom counsel has not yet entered an appearance electronically:

| | |
|---|---|
| Kathleen Sebelius<br>U.S. Dept. of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, DC  20201 | Office of the General Counsel<br>U.S. Dept. of Health and Human Services<br>200 Independence Avenue, SW<br>Room 713F<br>Washington, DC  20201 |
| Thomas Perez<br>U.S. Dept. of Labor<br>200 Constitution Ave., N.W.<br>Washington, DC  20210 | U.S. Dept. of Labor<br>200 Constitution Ave., N.W.<br>Room N 2427<br>Washington, DC  20210 |
| Jack Lew<br>U.S. Dept. of Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington, DC  20220 | U.S. Dept. of Treasury<br>1500 Pennsylvania Avenue, NW<br>Washington, DC  20220 |
| Eric Holder<br>Office of the Attorney General<br>U.S. Dept. of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC  20530-0001 | Barbara L. McQuade<br>U.S. Attorney for the Eastern District of Michigan<br>211 W. Fort Street<br>Suite 2001<br>Detroit, Michigan  48226 |

and via facsimile to:

Eric Holder, Office of the Attorney General
U.S. Department of Justice
(202) 514-0539

and, as requested by Defendants, via Electronic Mail to:

Benjamin L. Berwick
U.S. Department of Justice
Benjamin.L.Berwick@usdoj.gov

Bradley P. Humphreys
U.S. Department of Justice
Bradley.P.Humphreys@usdoj.gov

                                    THOMAS MORE LAW CENTER

                                    s/ Erin Mersino_____
                                    Erin Mersino, Esq. (P70886)