UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE AVE MARIA FOUNDATION, et al.,

    Plaintiffs,                                  Case No. 13-cv-15198

v.                                            HONORABLE STEPHEN J. MURPHY, III

KATHLEEN SEBELIUS, et al.,

    Defendants.

_____/

## **OPINION AND ORDER GRANTING A PRELIMINARY INJUNCTION**

Plaintiffs are five nonprofit organizations seeking to invalidate federal regulations that require employer-sponsored health insurance plans to include coverage for contraceptives, abortifacients, and sterilization at no cost to the plan beneficiaries. All five organizations object to the challenged regulations for religious reasons, and none of the organizations qualify for a "straight-up" exemption. Although Plaintiffs could avoid the requirement through an accommodation for religious objectors, to qualify, Plaintiffs must execute a self-certification that obliges their insurer to provide the objectionable services at no cost to the plan beneficiaries. Plaintiffs say that providing even indirect support for contraception, abortion, and sterilization would also violate their religious convictions.

Because failure to cover the required services or execute a self-certification by January 1, 2014 could have subjected Plaintiffs to financial penalties or other harms, Plaintiffs moved for a temporary restraining order. The Court granted the motion on the briefs and scheduled a hearing to determine if a preliminary injunction should issue. The Court canceled the hearing after the parties jointly moved for a ruling based on the submissions in their briefs. Having considered the parties' submissions, the Court will issue a preliminary injunction.

## BACKGROUND

I. <u>Statutory and Regulatory Framework</u>

The Affordable Care Act ("ACA") requires employers with fifty or more employees to offer health insurance plans meeting certain coverage requirements. *See* 26 U.S.C. § 4980H. Failure to comply exposes an employer to substantial fines. *See* 26 U.S.C. §§ 4980D(a), 4980H(a). Although smaller employers need not sponsor a health plan, if they elect to do so, the government asserts that their health plans must also meet the minimum coverage requirements.[1] Def.'s Resp. 5, ECF No. 9.

One such requirement is that health plans cover "preventative care and screening" for women "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ['HRSA']." 42 U.S.C. § 300gg-13(a)(4). The HRSA-adopted guidelines ("HRSA Mandate"), in turn, require coverage of "all Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity." HRSA, Women's Preventative Services: Required Health Plan Coverage Guidelines, *available at*

---

[1] Although the ACA may categorically exempt health plans offered by small employers from the minimum coverage requirements, *Korte v. Sebelius*, 735 F.3d 654, 661 (7th Cir. 2013); *see also* 26 U.S.C. § 4980H (mandating only that large employers sponsor health insurance plans); 26 U.S.C. § 4980D(d) (exempting "certain insured small employer plans" from fines for violations of the minimum coverage requirements), the parties here read 42 U.S.C. § 300gg-13(a) as extending such standards to all health plans. Pl.'s Br. 7, ECF No. 3; Def.'s Resp. 5. The parties' court filings accordingly reveal little about the size of the plaintiff organizations, but they appear to be a mix of large and small employers. Pl.'s Br. 15, 18.

Before rendering a final judgment, the Court may have to determine if the minimum coverage requirements apply to any plaintiffs that are small employers. But for purposes of considering Article III standing and a preliminary injunction, it is enough that the government intends to enforce the HRSA Mandate against small employers electing to offer health plans.

http://www.hrsa.gov/womensguidelines/ (last visited Jan. 13, 2014); *see also Eden Foods, Inc. v. Sebelius*, 733 F.3d 626, 628 (6th Cir. 2013).

The ACA and implementing regulations initially varied this requirement for grandfathered health plans and health plans sponsored by religious employers. *See* 42 U.S.C. § 18011(a)(2); 45 C.F.R. §§ 147.140, 147.131(a). A health plan is grandfathered if at least one person has been continuously enrolled in the plan since March 23, 2010, and if the terms of the plan have remained unchanged. *See* 45 C.F.R. § 147.140; *see also* 26 C.F.R. § 54.9815–1251T; 29 C.F.R. § 2590.715–1251. A "religious employer" (1) has the "inculcation of religious values as its purpose," (2) "primarily employs persons who share its religious tenets," (3) "primarily serves persons who share its religious tenets," and (4) is a non-profit organization under Sections 6033(a)(1) and 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code. 45 C.F.R. § 147.131(a)*.*

After receiving objections from organizations that did not qualify as religious employers, the government temporarily exempted nonprofit religious organizations from the HRSA Mandate. *See Korte*, 735 F.3d at 661–62. The government also proposed and adopted an "accommodation" that allows "eligible organizations" to avoid the HRSA Mandate through a self-certification process. Coverage of Certain Preventative Services under the Affordable Care Act, 78 Fed. Reg. 39,873–74 (July 2, 2013). An eligible organization is one that (1) "opposes providing coverage for some or all . . . contraceptive services . . . on account of religious objections"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a religious organization"; and (4) self-certifies that it satisfies the foregoing criteria. *See* 45 C.F.R. § 147.131(a).

Although an eligible organization is not required to file anything with the government, the organization must provide a copy of the self-certification to its health insurance provider. *See* 45 C.F.R. § 147.131(c)(1). The eligible organization is then relieved of any obligation to "contract, arrange, pay, or refer for contraceptive coverage," 78 Fed. Reg. at 39,874, and the organization's insurer must exclude contraceptive coverage from the organization's health plan, *see* 45 C.F.R. § 147.131(c). But receipt of the self-certification obliges the insurer to "[p]rovide separate payments for any contraceptive services required to be covered" at no cost to the plan beneficiaries and to notify them of the available coverage. 45 C.F.R. § 147.131(c)(2)(i)–(d).

The final rules governing the accommodation for eligible organizations became effective January 1, 2014, at which point the temporary safe harbor also expired. *See* 78 Fed. Reg. at 39,872.

II. The Plaintiff Organizations

Plaintiffs are five nonprofit organizations "founded, organized, and . . . maintained in conformity with and/or for furtherance of the teachings of the Catholic Church." Monaghan Decl. ¶ 28, ECF No. 3-2. The Ave Maria Foundation was founded "to promote and spread Catholic education, Catholic media, community projects, and other Catholic charities." Monaghan Decl. ¶ 7. It supports a variety of organizations, including three of its co-plaintiffs, that "teach the principles of the Catholic tradition," support the Catholic Church's "moral and social teachings," and educate the public about the Catholic Church. Monaghan Decl. ¶¶ 11, 18, 21, 23. The Ave Maria Foundation subscribes to the authoritative doctrine of the Catholic Church, including its teachings against contraception, abortion, sterilization, and abortifacients. Monaghan Decl. ¶¶ 9, 12, 17.

The Rhondora J. Donahue Academy, Inc., is a religious primary school "grounded in the traditions of the Roman Catholic Church." Monaghan Decl. ¶ 18–20. It "actively professes belief" in the authoritative teachings of the Catholic Church, including those related to sexual activity. Gurnsey Decl. ¶ 8, ECF No. 3-6. Ave Maria Communications produces Catholic radio programming and promotes Catholic teaching through a variety of media sources. Monaghan Decl. ¶¶ 21–22; Kresta Decl. ¶ 5, ECF No. 3-5. It too "actively professes belief" in the authoritative teachings of the Catholic Church, including those related to sexual activity. Kresta Decl. ¶ 7. The Thomas More Law Center is a "public interest law firm dedicated to education and litigation on issues of human life, religious freedom, and traditional family values." Monaghan Decl. ¶ 25. And Domino's Farms Petting Farm is a nonprofit that promotes understanding of "an agriculture lifestyle" and "operate[s] an animal petting farm" for educational purposes. Monaghan Decl. ¶ 27.

All five organizations maintain a group health insurance plan through Blue Cross/Blue Shield of Michigan. Zumda Decl. ¶¶ 5, ECF No. 3-4. Plaintiffs believe that providing health insurance is necessary to remain competitive employers and fulfills their "religious duty to provide for the health and well-being of [their] employees and their families." Monaghan Decl. ¶¶ 49, 52; *see also* Zumda Decl. ¶ 18; Kresta Decl. ¶ 20; Guernsey Decl. ¶ 21. But for religious reasons, Plaintiffs' health plan exclude coverage for abortion, abortifacients, sterilization, and artificial contraception. Monaghan Decl. ¶¶ 31–33; Zumda Decl. ¶¶ 12–13.

Notwithstanding the HRSA Mandate, Plaintiffs desire to continue providing health plans insurance coverage that excludes payments for abortions, sterilizations, and abortifacient and contraceptive drugs. Zumda, Decl. ¶ 17. But Plaintiffs' existing health plan is ineligible for grandfathered status due to changes in cost-sharing. Zumda Decl. ¶¶ 8–9.

5

None of the plaintiff organizations qualify as religious employers. And Plaintiffs object to self-certifying as eligible organizations, because, they submit, doing so will indirectly support contraception, sterilization, and abortion. Monaghan Decl. ¶¶ 33, 41–48.

## STANDARD OF REVIEW

A court may issue a preliminary injunction after weighing "'(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.'" *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)).

## DISCUSSION

I.  Likelihood of Success on the Merits

Plaintiffs seek injunctive relief under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb *et seq*. RFRA affords a cause of action to any person whose religious exercise is substantially burdened by government action even if the burden results from a rule of general applicability. *See* 42 U.S.C. § 2000bb-1.

A RFRA claim proceeds in two steps. "First, the plaintiff must make out a *prima facie* case by establishing Article III standing and showing that the law in question 'would (1) substantially burden (2) a sincere (3) religious exercise.'" *Autocam Corp. v. Sebelius*, 730 F.3d 618, 625 (6th Cir. 2013) (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428 (2006)). If the plaintiff makes those showings, then the government must demonstrate "'that application of the burden to the person (1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that . . . interest.'" *Id.* (quoting *O Centro*, 546 U.S. at 428).

### A. A Substantial Burden on a Sincere Religious Exercise

The centerpiece of the parties' dispute is over whether the HRSA Mandate substantially burdens Plaintiffs' religious exercise — a question on which there is a substantial division of opinion. *Compare, e.g.*, *Mich. Catholic Conference v. Sebelius*, No. 13-1247, 2013 WL 6838707 (W.D. Mich. Dec. 27, 2013); *Univ. of Notre Dame v. Sebelius*, No. 13-1276, 2013 WL 6804773 (N.D. Ind. Dec. 20, 2013); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 13-1261, 2013 WL 6672400 (D.D.C. Dec. 19, 2013), *with S. Nazarene Univ. v. Sebelius*, No. 13-1015, 2013 WL 6804265 (W.D. Okla. Dec. 23, 2013); *Reaching Souls Int'l, Inc. v. Sebelius*, No. 13-1092, 2013 WL 6804259 (W.D. Okla. Dec. 20, 2013); *Legatus v. Sebelius*, 12-12061, 2013 WL 6768607 (E.D. Mich. Dec. 20, 2013); *Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 12-2542, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013); *Zubik v. Sebelius*, Nos. 13-1459 & 13-303, 2013 WL 6118696 (W.D. Pa. Nov. 21, 2013). As the split of authorities suggests, neither side is guaranteed victory. Yet Plaintiffs here nevertheless show a strong likelihood of succeeding on the merits.

The substantial burden requirement reflects the Free Exercise jurisprudence that predated *Employment Division v. Smith*, 494 U.S. 872 (1990). *See O Centro*, 546 U.S. at 424; S. Rep. No. 103-111. Although there is no canonical definition of the phrase, generally, a burden is substantial if the government compels "an individual to choose between 'following the precepts of her religion and forfeiting benefits'" or "place[s] 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"

7

*Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 734–37 (6th Cir. 2007) (internal citations omitted); *see also, e.g., United States v. Lee,* 455 U.S. 252, 256–58 (1982) (the requirement to pay Social Security taxes substantially burdened an Amish employer who objected to the Social Security system); *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707 (1981) (a state cannot deny unemployment benefits to a Jehovah's Witness who quit a job making tank turrets); *Sherbert v. Verner*, 374 U.S. 398 (1963) (a state cannot deny unemployment benefits to a Seventh Day Adventist who refused to accept Saturday employment).

Conversely, RFRA offers no protection against government action that encumbers the practice of religion but does not pressure a litigant to violate his religious beliefs. *See Living Water Church of God*, 258 F. App'x at 374–75; *see also, e.g.*, *Jimmy Swaggart Ministries v. Bd. of Equalization*, 493 U.S. 378 (1990) (no right to refuse to pay a state's general sales and use taxes to conserve money for religious purposes). Religious objections directed at the government's internal procedures or its management of public property fall into this category. *See, e.g.*, *Lyng v. N'west Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) (no right to challenge agency plans to permit timber harvesting and road construction on government land); *Bowen v. Roy*, 476 U.S. 693 (1986) (no right to object to the government's use of a Social Security number); *Kaemmerling v. Lappin*, 553 F.3d 669 (D.C. Cir. 2008) (no right to object to the government's collection and use of DNA); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058 (9th Cir. 2008) (en banc) (no right to challenge the use of recycle wastewater to create artificial snow on public land).

Since the temporary safe harbor has now expired, Plaintiffs must (1) comply with the HRSA Mandate, (2) self-certify as an eligible organization, (3) offer a non-compliant health

insurance plan, or (4) discontinue offering health insurance altogether. Plaintiffs claim that taking either of the first two options would violate their religious beliefs. Disregarding the minimum coverage requirements may expose Plaintiffs to significant financial penalties. *See* 26 U.S.C. § 4980D(a). *But see* 26 U.S.C. § 4980D(d) (exempting certain small employers from the fines for noncompliance). And the final option — ending health benefits for employees — Plaintiffs view as undesirable from religious and business competitiveness standpoints. Discontinuing health insurance would also expose large employers to substantial fines. *See* 26 U.S.C. § 2680H(a).

At first glance, this array of alternatives compels Plaintiffs to choose between their religious beliefs and other consequences. Although the government might well argue that for small employers the option to exit the healthcare market will not substantially burden their religious exercise, the importance the government places on employed-sponsored health insurance in defending the ACA and HRSA Mandate tends to foreclose the response — and the government instead argues that the accommodation provides an escape, because it allows Plaintiffs to act "almost exactly what they would" have before the passage of the HRSA Mandate. Def.'s Resp. 4.

How little Plaintiffs must do to qualify for the accommodation would be highly relevant if they objected only to paying for contraceptives directly. Taking a few minutes to complete some paperwork would hardly be a significant burden on their religious exercise. But because Plaintiffs also object to executing the self-certification, the government's argument amounts to disbelief that the self-certification has much religious significance. And adopting this argument would therefore require an examination of the sincerity of Plaintiffs' professed beliefs — which the government does not question — or second-guessing the importance

9

or rationality of Plaintiffs' convictions — a task beyond the Court's ability or competence. *See* 42 U.S.C. § 2000cc-5(7)(A) (defining "religious exercise" in RFRA as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"); *Lee*, 455 U.S. at 257 ("It is not within 'the judicial function and judicial competence' . . . to determine whether appellee or the Government has the proper interpretation of the Amish faith; '[c]ourts are not arbiters of scriptural interpretation.'" (quoting *Thomas*, 450 U.S. at 716)); *Thomas*, 450 U.S. at 714–16 (refusing to decide whether a religious objector had appropriately concluded that he could produce steel used for weapons but not make the weapons themselves).

Contrary to the government's assertion, refusing to second-guess Plaintiffs' sincere beliefs of their religion prohibits does not make the substantial burden requirement a nullity. Courts may still evaluate whether a law pressures a litigant to modify her behavior and whether that pressure is significant. But having conceded that the accommodation requires Plaintiffs to change their behavior in some way — here, by executing a certification — the government cannot then label that newly required action as trivial. It is not the government's business to decide what behavior has religious significance. Only when a law or regulation requires "*no* action or forbearance" by a religious objector can the government dismiss otherwise significant burdens on religious exercise offhand. *Kaemmerling*, 553 F.3d at 679 (emphasis added); *see also id.* (explaining that the challenge regulations required no modification of "religious behavior in any way").

The government's fallback position — that the any burden on Plaintiffs' religious exercise is too attenuated to be substantial — suffers from the same defects as its principal argument. Def.'s Resp. 19. The HRSA Mandate requires Plaintiffs to act, directly burdening

10

their religious exercise. The only attenuation here concerns why Plaintiffs' believe they cannot execute the self-certification. Yet, to say that a person cannot attach religious significance to an act based on how others will react to it requires judging the rationality of a religious belief. And this, the courts cannot do. *See Lee*, 455 U.S. at 257; *Thomas*, 450 U.S. at 714–15.

The government is understandably concerned that religious objections predicated on remote consequences might cripple effective administration of laws. But a great number of religious objections based on third-party actions are dismissed simply because the plaintiff is not pressured to act in any way. *See, e.g.*, *Lyng*, 485 U.S. 439 (no right to challenge agency plans to permit timber harvesting and road construction on government land); *Bowen*, 476 U.S. 693 (no right to object to the government's use of a Social Security number); *Kaemmerling*, 553 F.3d 669 (no right to object to the government's collection and use of DNA); *Navajo Nation*, 535 F.3d 1058 (no right to challenge the use of recycle wastewater to create artificial snow on public land). And in the remaining cases, RFRA answers the government's concern with the compelling interest test. Although the test is stringent, in appropriate situations, courts indeed have found a compelling interest in the uniform administration of laws. *See, e.g.*, *Lee*, 455 U.S. 252 (an Amish employer had no right to refuse to pay Social Security taxes even though the requirement burdened religious exercise).

B. Compelling Interest Test

Because Plaintiffs have demonstrated that the challenged regulations are apt to substantially burden their religious exercise, the government must show that the applicable

regulations are the "least restrictive means of further [a] compelling governmental interest," 42 U.S.C. § 2000bb-1(b). The government is unlikely to do so.

1. Compelling Governmental Interest

A compelling governmental interest is one "of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *see also Lee*, 455 U.S. at 258 (describing the interest as "overriding"); *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) (describing the interest as "of the highest order"); *Sherbert*, 374 U.S. at 406 (describing the interest as "paramount"). Here, the government argues that the challenged regulations serve two compelling interests: the promotion of public health and gender equality. Def.'s Resp. 22, 24.

Considered in the abstract, both interests appear important. But the Supreme Court has warned against using "broadly formulated interests" to justify "the general applicability of government mandates." *O Centro*, 546 U.S. at 431. Because the government must justify the application of a law to "particular religious claimants" in a case, *id.*, the "law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited," *Lukumi*, 508 U.S. at 547 (internal quotation marks and citations omitted) (ellipsis in original)

Here, the sheer number of exceptions and stays to the HRSA Mandate undercut the government's argument that requiring religious objectors to provide contraceptive coverage furthers vital interests. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1143–44 (10th Cir. 2013) (en banc), *cert. granted*, 134 S. Ct. 678; *Gilardi v. U.S. Dep't of Health & Human Servs.*, 733 F.3d 1208, 1222 (D.C. Cir. 2013) (Opinion of Brown, J.); *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377,

414 (3d Cir. 2013) (Jordan, J., dissenting), *cert. granted*, 134 S. Ct. 678. Grandfathered health plans, religious employers' health plans, and possibly small employers' health plans need not meet the minimum coverage requirements, leaving "millions upon millions of people — by some estimates 190 million" — without health plans that provide free preventative services. *Conestoga Wood Specialties*, 724 F.3d at 414.

In response, the government argues that most health plans will eventually lose grandfathered status and that those who work for religious employers are less likely to use preventative services than those covered by the accommodation. Def.'s Resp. 26–28. Both explanations may be factually accurate, but they miss the point. All of the exceptions undermine the supposed necessity of applying the HRSA Mandate uniformly. For instance, the provision for religious employers shows that accommodating religious beliefs is sometimes more important than ensuring universal access to free contraceptives. The government is thus hard pressed to say that public health and gender equality justify applying the HRSA Mandate to some religious objectors but not others.

2. <u>Least Restrictive Means</u>

Even if government's interests are compelling, the government has not used the least restrictive means to further them. The least restrictive means inquiry involves "comparing the cost to the government of altering its activity to continue unimpeded versus the cost to the religious interest imposed by the government activity." *S. Ridge Baptist Church v. Indus. Comm'n of Ohio*, 911 F.2d 1203, 1206 (6th Cir. 1990). Plaintiffs suggest several alternative means by which the government could provide preventative services without burdening their religious exercise. These include providing the coverage directly to employees, working directly with third parties to provide the coverage, providing tax

incentives to patients or drug companies, or using existing healthcare exchanges to provide coverage. Pl.'s Br. 25; Pl.'s Reply 12, ECF No. 11.

The government argues against these options as requiring an exercise of statutory authority it does not possess or as imposing a significant financial and administrative burden on the government. Def.'s Resp. 28–32. Neither response is compelling. First, the government's assertion that it would need additional statutory authority misses the point of the compelling interest test, which probes whether the government as a whole could have acted differently. *See Roman Catholic Archdiocese*, 2013 WL 6579764, at *18. And second, the government is not persuasive in attempting to convince that implementing the Plaintiffs' proposals would entail great expense. The government's only support is a portion of the administrative record that explains other proposals were considered and deemed less effective. Def.'s Resp. 31 (citing 78 Fed. Reg. at 39,888). Without somehow quantifying the loss of effectiveness, the government cannot show that the HRSA Mandate is the least restrictive means of promoting public health and gender equality in light of the numerous other options available and the myriad of exceptions to it. *See Korte*, 735 F.3d at 686; *Gilardi*, 733 F.3d at 1222; *Roman Catholic Archdiocese*, 2013 WL 6579764, at *18.

II. Other Factors

Due to the similarity between RFRA and First Amendment claims, the likelihood of success on the merits tends to merge with the irreparable harm factor. *See Autocam Corp.*, 730 F.3d at 624 (citing *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)). The deprivation of protected freedoms for "even minimal periods of time . . . constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also McNeilly v. Land*, 684 F.3d 611, 621 (6th Cir. 2012). The same is true of the public interest factor.

Although it is generally in the public interest to permit the implementation of laws, *see Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008), the public has a stronger interest in preventing the loss of individual liberties, *see Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.4d 1474, 1490 (6th Cir. 1995). Because Plaintiffs are likely to succeed on their RFRA claim, the remaining factors also weigh in their favor.

III.     Balancing of the Equities

Because Plaintiffs have shown a strong possibility that they will succeed on the merits, issuance of a preliminary injunction is appropriate to prevent irreparable harm given the comparatively minimal harm will accrue to the government and other stakeholders. The merits question is difficult. Other courts, including the United States Court of Appeals for the Sixth Circuit, have issued injunctions in similar cases. *See, e.g.*, *Michigan Catholic Conference v. Sebelius*, No. 13-2723, Order (6th Cir. Dec. 31, 2013) (granting a stay pending appeal); *Catholic Diocese of Nashville v. Sebelius*, No. 13-6640, Order (6th Cir. Dec. 31, 2013) (granting a stay pending appeal). Because the equities weigh in favor of a preliminary injunction, the Court will also enjoin enforcement of the HRSA Mandate.[2]

---

[2] The Sixth Circuit has expedited appeals in *Michigan Catholic Conference v. Sebelius*, No. 13-2723, (6th Cir.), and *Catholic Diocese of Nashville v. Sebelius*, No. 13-6640, (6th Cir.), both of which present similar issues to the ones here. The Court, therefore, will consider staying this case pending the disposition of these appeals, and the Court invites the parties to submit their views on whether a stay is appropriate.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Defendants and their agents, officers, and employees are **ENJOINED** from enforcing against Plaintiffs any requirement that they provide contraception, sterilization, abortifacients, or related education and counseling in their employee health plan, pursuant to 42 U.S.C. § 300gg-13(a)(4) and implementing regulations.

**IT IS FURTHER ORDERED** that the parties may **SUBMIT** briefs on whether a stay should issue. Any briefs should be submitted within seven (7) days of the entry of this order, be no more than seven (7) pages in length, and conform to the Local Rules. No replies will be permitted without leave of the Court.

**SO ORDERED**.

                                                s/Stephen J. Murphy, III
                                                STEPHEN J. MURPHY, III
                                                United States District Judge

Dated: January 13, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on January 13, 2014, by electronic and/or ordinary mail.

                                                s/Carol Cohron
                                                Case Manager